## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UTILITY CONSTRUCTION COMPANY, INC., | § § § | No. __22-860 C__ |
| v. | § | |
| | § | |
| THE UNITED STATES, | § | |

### PLAINTIFF'S COMPLAINT AND REQUEST FOR RELIEF

**COMES NOW** Plaintiff, Utility Construction Company, Inc. ("Plaintiff" or "UCC"), through its undersigned counsel, and hereby files this Complaint and request for legal and equitable relief against Defendant, alleging as follows:

## I.   PARTIES, JURISDICTION, AND STANDING

### A.   Introduction

Plaintiff's claims arise under the Contract Disputes Act ("CDA"), 41 U.S.C.A. §7104(b)(1).  Under Contract No. FA468619DA004 for Electrical Multiple Award Construction Contract ("Contract" or "E-MACC") (*See* **Exhibit 1**, attached hereto and incorporated by reference herein).  Defendant issued a Firm Fixed Price Task Order (See **Exhibit 2**, attached hereto and incorporated by reference herein) to Plaintiff on April 8, 2020, for the Repair PAVE PAWS Substation Project ("Project") at Beale Air Force Base ("Beale AFB").  (**Exhibit 2**).  The Government-directed design work constituted a cardinal change to Task Order No. FA468620F0016 ("Task Order").  Since it is clear the Government still has a need for the requirements sought under the Task Order, Plaintiff asserts that the Government's termination for convenience was made in bad faith.  Plaintiff is entitled to all its increased costs associated with the Task Order, as well as its anticipated profits.  Alternatively, even if the Task Order's changes clause applies, which it does not due to the Government's breach resulting from either a cardinal

change or bad faith termination, Plaintiff is still entitled to additional costs incurred from the Task Order's defective specifications and Government-caused delay, as well as its reasonable termination expenses and costs resulting from the Government's termination for convenience, issued March 4, 2022.  Further, Defendant has breached its duty of good faith and fair dealing by refusing to properly address the foregoing issues related to this Contract.  Defendant's actions, as described herein, constitute breach of contract clauses and/or breach of contract based upon: cardinal change in the Contract and bad-faith termination; constructive change in the Contract and Government delay; appropriate adjustment of the contract price due to the foregoing; reasonable costs and expenses associated with termination for convenience to the extent not in bad faith; and breach of duty of good faith and fair dealing.

> **B.    The Parties**

1.      Plaintiff is an Arizona corporation.  It maintains its corporate office at 8435 E Baseline Road, Suite 106, Mesa, Arizona 85209-4382.

2.      The Defendant is the United States of America, acting by and through the United States Air Force, U.S. Air Combat Command, Beale AFB in Yuba County, California ("Defendant" or "Government").

> **C.    Jurisdiction and Venue**

3.      The United States Court of Federal Claims ("USCFC") has jurisdiction to consider and decide these claims and grant the relief requested pursuant to 28 U.S.C.A. § 1491 and 41 U.S.C.A. § 7103(f)(5).  Plaintiff brings this action pursuant to the CDA, 41 U.S.C.A. §7104(b)(1).  On May 26, 2022, Plaintiff submitted its Certified Claim for $14,925,418.03 to the 9 CONS Contracting Officer at Beale AFB, Ms. Aakanksha Bhargava ("KO").  Further, Plaintiff included a settlement proposal in the Certified Claim for $9,268,604.28.  However, the Government neither

responded to the Certified Claim nor requested additional time to render a decision within sixty (60) days of receiving the Certified Claim. 41 U.S.C.A. § 7103(f)(5).  The KO's failure to issue a decision within the required time period is deemed a denial of Plaintiff's Certified Claim. Therefore, this Court has jurisdiction over the following claims:  breach of contract, bad-faith termination or contract change and unjust delay by the Government, adjustment of the contract price due to any of the foregoing, as well reasonable costs and expenses associated with termination for convenience, and breach of duty of good faith and fair dealing claim.  As such, Plaintiff timely brings this action for *de novo* review of the Contract claims before this Court.

4.      Venue for this action is proper in the USCFC. 41 U.S.C. § 7104(b)(1) (fixing venue for appealing decisions on a claim in the USCFC).

**D.      Plaintiff Has Standing**

5.      Pursuant to 41 U.S.C.A. §§§ 7103(f)(5), 7104(b)(1), and 7104(b)(3), Plaintiff has standing to pursue its claims in this Court, as Plaintiff has timely submitted its claims to the KO, more than sixty (60) days have elapsed from the date Plaintiff submitted the Certified Claim and materials, and the Certified Claim has consequently been denied since the Government failed to render a decision within the required time period.

## II.    PROCEDURAL HISTORY

6.      The subject contract between Plaintiff and Defendant was a firm fixed task order entered into by parties on April 8, 2020.  The contract between the parties was Task Order No. FA468620F0016 (the "Task Order") for the Project issued under Contract No. FA468619DA004 for the Contract.  As set forth in more detail below, the Government-directed design work constituted a cardinal change to the Task Order.  Upon numerous notices from Plaintiff to the Government regarding the Task Order's defects, Plaintiff was unable to invoice for work

anticipated to be completed per the approved schedule for a period of 656 days, causing Plaintiff to incur additional costs totaling $6,422,418.03, not including lost profits.  Aside from the Task Order's blatant defects, the work directed by the Government was outside of the scope of the Task Order, and the Government's termination for convenience was unequivocally made in bad faith as evidenced by the Government's two (2) years' worth of delay tactics.

7.      Due to the Government's breach of contract, Plaintiff submitted the Certified Claim (**Exhibit 45**)[1] to the KO for $14,925,418.03 on May 26, 2022.  (*See* **Exhibit 31,** attached hereto and incorporated by reference herein).  Further, Plaintiff included a settlement proposal in the Certified Claim for $9,268,604.28.  *Id.*  Since Plaintiff's submission of the Claim, Plaintiff has diligently sent numerous e-mails to the KO requesting:  (1) confirmation of receipt of the Claim; (2) that the Government provide Plaintiff a bond release form for the terminated Contract; (3) to meet and confer about the Claim; and lastly, (4) the Government's timeline regarding Plaintiff's Certified Claim.  On June 27, 2022, the KO informed Plaintiff via e-mail that the Government would have a  better idea of a timeline once the Civil Engineer Squadron and the 9th Contracting Squadron completed their review of all documents.  Presently, the KO has neither replied to Plaintiff's request for a timeline nor contacted Plaintiff regarding the Claim since June 27, 2022. Therefore, since the Government has wholly failed to finally and fully resolve the issues set forth herein, and in the absence of a decision on a Certified Claim within the required time period by the KO, Plaintiff has been left with no other remedy but to pursue a resolution of these matters in this Court.

---

[1]      The claim submitted to the KO, Exhibit 45 here, is attached hereto without its supporting exhibits, as the supporting exhibits to the claim are at Exhibits 1-44 attached here.

III.    FACTS

A.    General Overview of the Issues

8.    The primary issue with the Contract is the cardinal change to the Task Order based on the Government-directed design work.  The Statement of Need ("SON") for the Task Order provided that Plaintiff would conduct all work stated in the SON to repair the substation and construct a new substation building, but the Government would provide the design drawings and specifications to Plaintiff.  Hence, as provided by the Task Order, Plaintiff was not responsible for providing any design plans or specifications.  However, as has been acknowledged by the Government, the Project designs and specifications it provided were so defective that it was impossible for Plaintiff to use the Government provided designs and specifications to construct the items provided by the Task Order.  A cardinal change exists here since the Government-directed design work had significant defects and the work needed to cure these defects was outside the scope of the Task Order.

9.    Per the approved Project schedule and as directed by the Government, Plaintiff mobilized equipment on June 11, 2020.  Plaintiff nearly maximized its bonding capacity for this Contract and held its equipment and labor at the ready to perform.  The Government, for its part, whipsawed Plaintiff, first with a Suspension of Work order and later Release of Suspension of Work, always requiring design work to continue and the rest to stand at the ready, but then ultimately terminated the contract for convenience almost two (2) years later on March 4, 2022, even though the requirement still existed.  Throughout this 656-day period, Plaintiff put the Government on notice of these defects, but the Government engaged in a course of delay tactics by:  requiring multiple requests for equitable adjustment and revisions to the same from Plaintiff for all of its claims other than those for the costs associated with performing the out-of-scope

5

design work, requiring Plaintiff to submit separate requests for modification, providing untimely responses to Plaintiff, and performing other tactics to cause further delay. As is evident from the facts, including the Government's almost immediate response of issuing a Termination for Convenience Notice after inquiries from Plaintiff regarding the modifications in the Task Order and its present need for the requirements sought under the Task Order, it is clear the Government's Termination for Convenience was made in bad faith. Lastly, even in the absence of a cardinal change, Plaintiff would still be entitled to equitable adjustment based on the constructive changes to the contract which caused increased costs and undue delay from the defective specifications.

   i.    **Cardinal Change to the Contract and Bad-Faith Termination**

   10.    The Task Order (**Exhibit 2),** which was entered on April 8, 2020, was a Firm-Fixed Price Task Order for the Repair Project. The Task Order was issued under the Contract (**Exhibit 1**) at Beale AFB. The Project's initial SON (***See* Exhibit 3,** attached hereto and incorporated by reference herein) dated July 9, 2019, stated as follows:

> "This Project is located on Beale Air Force Base, Ca PAVE PAWS area (See attachment – Site Map). The contractor shall furnish all labor supervision, transportation, materials, testing, analysis, reports, permits, hauling, tools and equipment as required to accomplish all work involved in repairing the substation and constructing a new substation Bldg. The contractor shall accomplish all work stated in this Statement of Need (SON) in strict compliance with the drawings provided with the solicitation." (**Exhibit 3** SON at § 2).

   11.    Similarly, the first Major Line Item of Work set forth in the SON was: "Repair the PAVE PAWS substation in accordance with the design package provided." (*Id*. at § 4(A)(1)). Also, the SON's second Major Line Item of Work was: "Repair work, temporary power plan, contractor staging areas, demolition work and construction of prefabricated electrical power substation building shall all be in accordance with the design drawings and specifications issued for construction." (*Id*. at § 4(A)(2)). Likewise, the SON listed the following as Government

Furnished Information ("GFI"):  "Government will provide design drawings and specifications to contractor. However, it is the responsibility of the contractor to do their due diligence and verify the accuracy of all provided information."  (*Id*. at § 9(A)).  As such, for the repair of the existing substation and construction of the new substation building, Plaintiff was not required to do any design work.

12.     To be certain, the E-MACC had a funded CLIN for design and development work. More particularly, CLIN 0001 of the Contract states:  "Design Contractor shall provide labor, materials, equipment, transportation, supervision, quality control, and other items necessary to design a range of construction repair and minor construction in the electrical disciplines for low, medium and high voltage." (*See* **Exhibit 1**, at p. 4).  On information and belief, this work was supposed to be performed by another contractor.  The only other relevant, funded CLIN under the Contract, is CLIN 0002, which provides:  "Construction Contractor shall provide all labor, materials, equipment, transportation, supervision, quality control, and other items necessary to manage and accomplish a range of construction repair and minor construction in the electrical disciplines for low, medium and high voltage work. Work shall be performed at Beale AFB, CA or satellite locations as dictated by the individual task orders." (*Id*.).  Moreover, Plaintiff's Task Order did not contain a CLIN for design and development work with respect to the existing substation and new substation building.  (*See* **Exhibit 2**, Task Order at § B).  Rather, the CLIN for the repair and construction, which is CLIN 0002 of the Task Order, simply provides as follows: "Base Construction, PAVE PAWS Substation Repair."  (*Id*.).  Had any design work by Plaintiff been contemplated in connection with the substation, the Government certainly would have set forth same in a funded CLIN.  This is especially true given that the Government added a design CLIN for the optional Motor Operated Disconnects.  (*See Id.* at CLIN 1001).

13.     Based on the understanding that it would not be required to provide any design or development work for the substation, Plaintiff mobilized on June 11, 2020, with an anticipated construction start date of November 3, 2020.  (*See* **Exhibit 4,** attached hereto and incorporated by reference herein).  During this time, Plaintiff discovered the Government-provided designs and specifications were defective.  For example, Plaintiff discovered the designs and specifications for the transformers, the control room, and the 5kV switchgear were all significantly defective. Moreover, during the October 16, 2020, verification of current site conditions/plans per its approved schedule (**Exhibit 4**), Plaintiff discovered that the plans for construction of the temporary substation were incomplete and never stamped by the engineer.  In fact, those plans were not even construction plans.  Plaintiff timely brought all defects it identified to the attention of the Government as soon as they were discovered.  Because of these issues, and the Government's lack of a timely response to same, construction was delayed.

14.     Plaintiff's efforts to manage and resolve these defects are documented in a series of e-mail correspondence with the Government, several in-person and telephonic meetings with the Government, via Plaintiff's Government-requested subcontracting with subconsultants to identify and communicate these issues to the Government, and a series of Requests for Information ("RFI") (*See* **Exhibit 5,** attached hereto and incorporated by reference herein**).**  Some evidence of these efforts is as follows:

- December 8, 2020, e-mail from the Government acknowledging changes and stressing to begin construction immediately.  (*See* **Exhibit 6**, attached hereto and incorporated by reference herein ).

- January 8, 2021, letter from Plaintiff to Government with Summary of Conference Call.  (*See* **Exhibit 34,** attached hereto and incorporated by reference herein).

- February 9, 2021, e-mail from the Government advising on potential technical help for Plaintiff from Bridge View Resources ("BVR"), "… technical experts who understood 9 CES's engineering team processes and fluently spoke the federal engineering language…" (**Exhibit 6**).

- May 10, 2021, letter and table from BVR with initial assessment advising the Government that the designs and specifications were impossible to construct as provided by the Government. (*See* **Exhibit 7,** attached hereto and incorporated by reference herein).

- BVR's list of plan sheets needing revision in order to construct a complete and functional Project. (*See* **Exhibit 8**, attached hereto and incorporated by reference herein).

- BVR Change Orders stating that after detailed review, designs and specifications provided to Plaintiff by the Government were only 65% complete when they should have been, and were represented to be, 100% complete. (*See* **Exhibit 9**, attached hereto and incorporated by reference herein).

- RFIs, which include the Government's direction to "complete, certify and take full responsibility of design and specifications for PAVE PAWS substation project." (**Exhibit 5).**

15.     It is well documented, known, and acknowledged by the Government that the Project designs and specifications it provided to Plaintiff were so defective that it was impossible for Plaintiff to utilize same to construct the items required by the Task Order.  Moreover, the additional time resulting from the Task Order's defects totals 656 days, and the additional costs related to the defects total $6,422,418.03.  (See **Exhibit 31,** Summary B. Request for Equitable Adjustment).

16.     In an effort to correct the defects, the Government requested that Plaintiff perform design and development work with respect to the existing substation and new substation building. This is evidenced by, among other things, the correspondence and RFIs noted above.  Additionally, the Government's direction to proceed with this design and development work is specifically set

forth, acknowledged, and further authorized by its September 8, 2021 Suspension of Work notice. (*See* **Exhibit 10**, attached hereto and incorporated by reference herein).  More specifically, that notice states as follows:  (1) "Performance on the design and ordering of materials is authorized to continue. Including but not limited to attending meetings, submitting any and all required documentation for the continued work."; and (2) "You are authorized to continue progress on both design and ordering of materials for the subject project."  Again, however, the Task Order did not call for Plaintiff to perform design or development work in connection with the substation and there was no funded CLIN with the right color of money for this type of work.  Given that the Government-directed design work was outside the scope of the Task Order, as recognized by the Government, and the significance of the defects, it is clear that a "cardinal change" exists here.

17.     Further, the Government's termination for convenience was made in bad faith.  As is evident from the facts, the Government knew or should have known that its designs and specifications were defective.  When Plaintiff put the Government on notice of these defects, the Government then engaged in a course of delay tactics, which included, among other things, requiring multiple requests for equitable adjustment and revisions to same from Plaintiff for all of its claims other than those for the costs associated with performing the out-of-scope design work. (See **Exhibits 6 and 11,** attached hereto and incorporated by reference herein).  With respect to the out-of-scope work, the Government required Plaintiff to submit a separate request for modification.  (*See* **Exhibits 6 and 12,** attached hereto and incorporated by reference herein).  The Government's clear hope with this, as can be gleaned from the correspondence and its delay of almost two (2) years since Plaintiff started bringing the defects to its attention, was to attempt to have Plaintiff execute a modification thereby waiving its "cardinal change" claim.  Plaintiff's contention that this was the Government's intended result is evident from the fact that, upon

queries from Plaintiff regarding the modification and its implications, the Government almost immediately issued its Termination for Convenience.  (*See* **Exhibits 6 and 13,** attached hereto and incorporated by reference herein).  It did this despite having sat on Plaintiff's proposals for almost one (1) year without any substantive response other than to require revisions designed to elicit its desired waiver of rights.  It also did this despite the fact that the requirements of the Task Order still exist, as evidenced by, among other things, the Government's authorization to continue work in process for the transformers and other indicia that the requirement still exists and is being continued in other ways.  (**Exhibit 6**)  Based on the aforementioned facts, it is clear the Government's Termination for Convenience is in bad faith.

18.     Plaintiff initially identified defective specifications shortly after mobilization on June 12, 2020, when work began on equipment allocation and long lead item procurement. (**Exhibit 4**, Task ID 15)  From that period on, ALL of Plaintiff's incurred payroll expense was solely to identify and resolve defective specifications and develop constructable design and specifications.  Plaintiff is due these wages paid, which include some of the following efforts:

- Attend regular meetings (both in-person and telephonic) with the Government to communicate the extent of defective specifications and coordinate new design efforts.
- Technical review of project documents.
- Extensive RFI process, including 93 at the time of termination for convenience.  This also includes multiple revisions of formatting and wording of these RFIs at the request of the Government, due largely to the multiple project managers the Government had assigned to this project. (**Exhibit 5**).
- Coordination with long lead item vendors to verify defective specifications and develop new specifications.
- Prepare planning documents and schedules for the sole benefit of the Government, with multiple revisions at the Government's request.  (*See* **Exhibit 14,** attached hereto and incorporated by reference herein).
- Procurement and management of subconsultants and subcontractors to develop designs and specifications.

11

- Prepare Request for Equitable Adjustments with multiple revisions at the Government's request.  (**Exhibit 11**).
- Prepare and revise Proposal of Contract Modification with multiple revisions at the Government's request.  (**Exhibit 12**).
- De-brief and re-submit many of the documents mentioned above for new Government appointed project managers.  There were five (5) different PMs during this project.
- Multiple site visits to verify dimensions and take field measurements to confirm the un-constructability of the Government-provided design and obtain details to complete design.
- Coordination of new design with other contractors and projects on base.
- Develop and prepare long lead time material specifications, including two (2) new sections.  (*See* **Exhibit 15,** attached hereto and incorporated by reference herein).
- Develop and prepare design documents, which include revisions to 65 of the original plan sheets and adding an additional 33 plan sheets that were missing from the Government design.  (*See* **Exhibit 8**).

19.     Plaintiff had mobilized equipment on June 11, 2020, per the approved project schedule (**Exhibit 4**, Task ID 15).  This equipment remained ready to perform on the contract until the receipt of the Termination for Convenience on March 4, 2022.  (**Exhibit 13**).  While there was a Suspension of Work order issued on September 8, 2021 (**Exhibit 10**), Plaintiff did not de-mobilize equipment due to the fact that shortly thereafter it received a Release of Suspension of Work (*See* **Exhibit 16,** attached hereto and incorporated by reference herein) on November 16, 2021, before equipment had been removed from the site.  In order to avoid the unnecessary costs of de-mobilization and then re-mobilization, Plaintiff kept the equipment ready to perform until receipt of the Termination for Convenience.  Plaintiff is due the costs of this equipment that was dedicated to the performance of this contract since it was unable to be allocated to other profit-generating opportunities while Plaintiff was still under contractual obligation to perform on this task order.

20. Plaintiff contracted with multiple subconsultants to help identify the extent of the defective specifications, communicate these issues to the Government, develop solutions to resolve defective specifications, and ultimately complete the design and specifications to a constructable level of detail. The Subconsultants utilized for these efforts are outlined below:

- Bridge View Resources: After extensive efforts to illustrate the extent of the deficient Government-provided design and specifications, Plaintiff was directed by the Government to solicit the help of this engineer to resolve defective specifications. The work performed by this engineer included the initial review of Government-provided plans and specifications, preparation of an opinion that the Government-issued plans and specifications were defective and non-constructable, and ultimately the duties of the engineer of record to complete the defective designs and specifications to a constructable level of detail, from the 65% level of design to 100% Sealed drawings. (*See* **Exhibit 5,** RFIs 52 through 66.1 and **Exhibit 17,** attached hereto and incorporated by reference herein).

- Lundquist Consulting Services, Inc.: One (1) of the first tasks upon mobilization was to prepare submittals for the Power Transformer. It was discovered that the Government-provided specifications for this long lead material were defective. Plaintiff hired Lundquist to review and provide input on the extent of the defects. Once the Government acknowledged the defective specifications and directed Plaintiff to prepare a new specification for this equipment, Plaintiff hired Lundquist for this work. (*See* **Exhibit 5**, RFIs 9 through 25, 43, 50 through 51.1, 68 through 68.1, and **Exhibit 18,** attached hereto, and incorporated by reference herein).

- SEL: The Government-issued design was missing several details and plan sheets that are required to construct a complete and functional substation protection and controls system. Plaintiff hired SEL to complete these details. (*See* **Exhibit 5**, RFIs 58 through 58.1, 61.1, 65 through 65.1, 73 through 73.1, and **Exhibit 19,** attached hereto, and incorporated by reference herein)

- Structural Systems Solutions, Inc.: It was discovered that the Government-provided structural design was incomplete, not compliant with code, and not prepared by a registered professional structural engineer. Plaintiff was directed by the Government to prepare the necessary structural designs and calculations that were missing from the Government-issued plans and specifications. Plaintiff hired Structural Systems Solutions, Inc. for this

13

work.  (*See* **Exhibit 5**, RFIs 32, 48, 53 through 53.1, 76 through 76.1, and **Exhibit 20,** attached hereto, and incorporated by reference herein).

- Hart High Voltage:  Plaintiff was directed by the Government to perform field testing on the existing Transformers to verify the suitability of use in the revised temporary substation design.  Plaintiff hired Hart High Voltage for this work.  (**Exhibit 5**, RFIs 49, 70).

- Comprehensive Security Services, Inc.:  Several of the tasks Plaintiff performed to identify the extent of the defective specifications and to develop designs required visits to the work site.  The work site is a secured facility, and the Government required Plaintiff to have a security company on-site at all times.  Plaintiff hired Comprehensive Security Systems, Inc. to meet this requirement.  (*See* **Exhibits 22 and 34,** attached hereto and incorporated by reference herein).

- NSP-BCH:  This subcontractor was hired to provide the project manager with personnel to assist with matters of management of this Task Order.  This subcontractor's efforts went to assisting with the identification of defective specifications and the management of design development work.  (*See* **Exhibit 23,** attached hereto and incorporated by reference herein).

- Malyzek Consulting Corp:  Due to the lack of cooperation and conflicting direction provided by the Government, Plaintiff hired this subconsultant to provide consulting for the extensive RFI, REA, and Contract Modification process.  (*See* **Exhibit 24,** attached hereto and incorporated by reference herein).

- Neel, Hooper & Banes, P.C.:  After being directed to make several revisions to RFIs, REAs, and Contract Modifications, Plaintiff hired Neel, Hooper & Banes, P.C. to assist in the preparation of these documents and to assist with negotiations of the Government's unreasonable positions, to assist with filing the Certified Claim, and ultimately to assist in filing this claim.  (*See* **Exhibit 25,** attached hereto and incorporated by reference herein).

21.    Plaintiff was initially unable to order long lead materials due to defective Government specifications.  Once the Government acknowledged the defects, Plaintiff was directed to prepare constructable specifications and submit them to the Government for approval.  (**Exhibits 5, 10, and 14**).  Once approved, and at the direction of the Government (**Exhibit 14**), Plaintiff issued purchase orders for the Power Transformer (**Exhibit 026**) and 5kV Switchgear

(*See* **Exhibit 27,** attached hereto and incorporated by reference herein) before the issuance of the Termination for Convenience on March 4, 2022.  At that time, the materials were in unfinished states.  The Government directed Plaintiff to continue with the procurement of the Power Transformer and to deliver it to the base.  (**Exhibit 6**).  Plaintiff is due the costs associated with the procurement of the Power Transformer and the increase in the cost of the Power Transformer from the original Government-issued specifications to the Government-approved revised specifications.  The 5kV Switchgear was canceled with a settlement for the preparation of Government approved-engineered shop drawings.  Plaintiff is due the settlement cost to cancel the 5kV Switchgear.

22.    In support of the effort to resolve the Government's defective specifications and develop designs, Plaintiff incurred other miscellaneous direct expenses, some of which include bonds, fuel, small tools, plans and printing, drinking water/ice, postage, delivery, freight, utilities, travel, yard rental, and staff training.

23.    At the request of the Government, Plaintiff submitted certified pricing before issuance of this Task Order.  (*See* **Exhibit 28,** attached hereto and incorporated by reference herein).  This certified pricing showed an overhead rate of 15% and a profit rate of 10%.  Plaintiff is due these markups on direct costs.

24.    Plaintiff was unable to invoice for work anticipated to be completed per the approved schedule for a period of 656 days.  Plaintiff is entitled to unrecovered overhead during this period, calculated per the Eichleay formula.  (*See* **Exhibit 42,** attached hereto and incorporated by reference herein).

25.    As mentioned above, Plaintiff anticipated a 10% profit on the total Task Order amount at the time of the bid.  Plaintiff is entitled to the profits lost due to the Governments breach

of contract.  Plaintiff is entitled to this profit on the total Task Order amount, including the equitable adjustment for extra work involved with defective specifications and design development (**Exhibits 28 and 31**).

26.    As outlined above, Plaintiff dedicated staff, equipment, bonding capacity, and other corporate resources to the resolution of defective specifications for a period of 656 days.  During this period, Plaintiff was not only unable to invoice for work anticipated to be completed per the approved project schedule but was unable to pursue other business opportunities.  The result of this was a significant decline in company revenue and profit over this period of time.  Plaintiff had enjoyed year after year of growth leading up to the onset of the defective specifications and has since then experienced a loss of overall revenue for the company.  Plaintiff is entitled to compensation for these lost profits.  It is important to note that as of the date this Claim was prepared, UCC has not received a release for the bond on this project.  UCC will continue to accumulate damages from Missed Profits from Opportunities Lost until this bond is released and available for other contracting opportunities.

ii.    **Equitable Adjustment**

27.    A cardinal change does exist here, but even if there was not a cardinal change, at the very least there was a constructive change to the Contract, and Plaintiff is entitled to equitable adjustment pursuant to the Task Order.  Increased costs to which Plaintiff is entitled to an equitable adjustment are provided in the following paragraphs.

28.    As the Government is aware, the Contract contains the following changes clauses: FAR 52.243-4 and FAR 52.243-5.  Since the Task Order was above the simplified acquisition threshold, FAR 52.243-4 would apply.  That provision states, in pertinent part, that:

  If any change under this clause causes an increase or decrease in the Contractor's
  cost of, or the time required for, the performance of any part of the work under this

contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications. FAR 52.243-4(d).

29.     As set forth above, the increased costs experienced by Plaintiff stem solely from the defective designs and specifications provided by the Government.  Consequently, the twenty (20)-day limitation set forth in FAR 52243-4(d) is inapplicable.  With respect to notice to the Government, FAR 52.243-4(e) provides:

The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause or (2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of proposal, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) above.

30.     In each instance where this requirement is not otherwise waived, as set forth in more detail below, Plaintiff timely notified the Government of changes and asserted its right to an equitable adjustment.

31.     As outlined in the above section regarding cardinal changes, Plaintiff began working on defective specifications on June 12, 2020, which is when work began on the preparation of submittals for the Power Transformer per the approved schedule (**Exhibit 4,** Task ID 15).  Plaintiff experienced an additional 656 days of contract time to identify and attempt to resolve defective specifications and develop design.  During this period of time, the Government would not allow Plaintiff to submit invoices for completed work, despite Plaintiff's numerous requests to do so.  (**Exhibit 6**).  Plaintiff was unable to allocate resources to other revenue-

generating activities due to being under contract and at risk for performance of this Task Order. This resulted in unabsorbed overhead expenses of $2,882,018.12, as calculated by the Eichleay formula (**Exhibit 42**). Additionally, Plaintiff had equipment allocated to this Task Order and ready to perform during this period of extra work to identify and resolve defective specifications. Some of this equipment was utilized in the design development efforts, while other equipment remained idle. The value of this equipment that was dedicated to the performance of this Task Order is equal to $930,080.79 (before overhead and profit), with $379,215.98 for equipment utilized for the identification of defective specifications and development of design, $499,614.81 for idle equipment on standby, and $51,250.00 for demobilization costs (**Exhibit 31**).

32.     As set forth in the Task Order's changes clause, Plaintiff is entitled to the increased costs it reasonably incurred in attempting to comply with the Government's defective specifications.   FAR 52.243-4(d).   Here, Plaintiff incurred additional labor costs at the Government's direction in attempting to comply with the defective specifications.

33.     As outlined in the cardinal changes section, Plaintiff incurred $625,361.07 of wages (before overhead and profit) to identify defective specifications and develop designs. Of that amount, $338,762.11 was for the period from the initial discovery of defective specifications on June 12, 2020 to the issuance of the Suspension of Work on September 8, 2021. From the Suspension of Work to the Termination for Convenience, UCC incurred an additional $286,598.97 in labor costs. (**Exhibit 31**).

34.     As set forth in the Task Order's changes clause, Plaintiff is entitled to the increased costs it reasonably incurred in attempting to comply with the Government's defective specifications. FAR 52.243-4(d). Here, UCC incurred additional subcontractor and subconsultant costs at the Government's direction in attempting to comply with the defective specifications. All

18

of the subcontractors outlined in the cardinal changes section of this claim were hired for the identification and resolution of defective specifications and to develop designs.  The cost incurred for these subcontractors equals $566,846.44 (before profit and overhead), of which $261,371.45 was completed before the Suspension of Work order and $305,474.99 was incurred after (**Exhibit 31**).

35.    As set forth in the Task Order's changes clause, Plaintiff is entitled to the increased costs it reasonably incurred in attempting to comply with the Government's defective specifications.   FAR 52.243-4(d).   Here, Plaintiff incurred additional material costs at the Government's direction in attempting to comply with the defective specifications.

36.    As outlined in the cardinal change section of this claim, the only materials that were incurred before the issuance of the Termination for Convenience were for the Power Transformer and the 5kV Switchgear.  The total cost of these materials is $1,440,095.32 before overhead and profit.  (**Exhibit 31**).  The Power Transformer increased in cost from the original quote based on defective specifications to the time the equipment was ordered with the Plaintiff-developed and Government-approved specifications by $419,200.00 (**Exhibit 32**).  In addition to this increase in cost due to changes in specifications, UCC incurred additional costs of $39,351.84 to perform Factory Acceptance Testing ("FAT") and unloading and delivery based on Government changes and delays.  The 5kV Switchgear incurred an additional cost of $20,000.00 for the preparation of engineering documents before the Termination of Convenience was received.  (*See* **Exhibit 33,** attached hereto and incorporated by reference herein).

37.    As the Government is aware, the Contract contains a Suspension of Work clause (FAR 52.242-14).  The clause provides as follows:

(a) The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this contract for the period of time that

19

the Contracting Officer determines appropriate for the convenience of the Government.

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

(c) A claim under this clause shall not be allowed (1) for any costs incurred more than 20 days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order), and (2) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the suspension, delay, or interruption, but not later than the date of final payment under the contract.

38.     Typically, courts have held that if a suspension is brought about by defective government specifications or designs, any delay is unreasonable if the defect was not obvious to the contractor, where here it was not.  Alternatively, and to the extent the Task Order's changes clause does not apply to Plaintiff's claims, Plaintiff hereby seeks to delay costs and labor costs (excluding those related to design) pursuant to the Task Order's Suspension of Work clause.

### iii.     **Termination for Convenience**

39.     The applicable termination for convenience clauses in the contract are FAR 52.249-2 and FAR 52.249-3.  However, FAR 52.249-2, Alternate 1, is only applicable in part because the Contract as changed was largely for design, not construction as contemplated by Alternate 1. Moreover, to the extent these clauses apply, they only limit the compensation claimed to the

adjusted contract price to the extent that the foregoing changes are within the scope of the contract, which as demonstrated above they are not, and then as adjusted for supplies or services directed by the Government, along any recognized work in progress.  FAR 52.249-2(g) and FAR 52.249-3(g).

40.    The formula to determine recovery for terminations for convenience is the percentage of the adjusted contract price reflecting the costs and other charges for the work completed, in progress, or to be settled and paid at termination, including a reasonable profit thereon, plus the reasonable settlement expenses resulting from termination.  As noted above, the Task Order price should be adjusted to account for the increased costs and additional work associated with the Government's directed changes and defective specifications, plus a reasonable profit thereon, for a total on the Task Order of $14,925,418.03 which represents Plaintiff's entitlement under the first prong.  The second prong allows for settlement expenses as well as charges appropriate to ensure fair compensation.  Plaintiff incurred costs based on the revised contract price, plus work in progress is $9,206,115.21, and administrative and legal settlement expenses attributable to the Termination for Convenience are $62,489.06.  However, the amount to which Plaintiff is entitled under either prong may be revised as the case progresses to reflect funds paid by the Government to UCC.

## IV.    CAUSES OF ACTION

### A.    Breach of Contract

#### i.    <u>Cardinal Change and Bad-Faith Termination</u>

41.    The allegations set forth in Paragraphs 1-40 above are incorporated herein by reference as though set forth in full.

42.     A cardinal change is an alteration in the work so drastic that it effectively requires the contractor to  (1) perform work materially different than what was specified in the contract, and (2) it amounts to an actual breach of contract.  *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014).

43.     The Government's defective designs and specifications required Plaintiff to perform work materially different than what was specified in the Contract since the Contract's scope only required Plaintiff's work ***using*** the Government's designs and specifications.  Because the duties Plaintiff had to perform were materially different than what was stated in the Task Order's SON, the Government's defective designs and specifications amount to a cardinal change.

44.     Plaintiff's efforts to manage and resolve these defects are documented in a series of e-mail correspondence with the Government, several in-person and telephonic meetings with the Government, via Plaintiff's Government-requested subcontracting with subconsultants to identify and communicate these issues to the Government, and a series of RFIs  (**Exhibit 5**).  Some evidence of these efforts is as follows:

- December 8, 2020, e-mail from the Government acknowledging changes and stressing to begin construction immediately.  (**Exhibit 6**).

- January 8, 2021, letter from Plaintiff to Government with Summary of Conference Call.  (**Exhibit 34**).

- February 9, 2021, e-mail from the Government advising on potential technical help for Plaintiff from BVR, "… technical experts who understood 9 CES's engineering team processes and fluently spoke the federal engineering language…"  (**Exhibit 6**).

- May 10, 2021, letter and table from BVR with initial assessment advising the Government that the designs and specifications were impossible to construct as provided by the Government.  (**Exhibit 7**).

- BVR's list of plan sheets needing revision in order to construct a complete and functional Project. (**Exhibit 8**).

- BVR Change Orders stating that after detailed review, designs and specifications provided to Plaintiff by the Government were only 65% complete when they should have been, and were represented to be, 100% complete. (**Exhibit 9**).

- RFIs, which include Government's direction to "complete, certify and take full responsibility of design and specifications for PAVE PAWS substation project." (**Exhibit 5**).

45.     It is well documented, known, and acknowledged by the Government that the Project designs and specifications it provided to Plaintiff were so defective that it was impossible for Plaintiff to utilize same to construct the items required by the Task Order.  Moreover, the additional time resulting from the Task Order's defects totals 656 days, and the additional costs related to wages, equipment, subcontractors, materials, other costs, overhead and profit, unrecovered overhead, lost profits, and missed profits from opportunities lost.

46.     Further, the Government's Termination for Convenience was made in bad faith because a requirement still exists for this work.  Moreover, as is evident from the facts, the Government knew its designs and specifications were defective.  When Plaintiff put the Government on notice of these defects, the Government then engaged in a course of delay tactics, which included, among other things, requiring multiple requests for equitable adjustment and revisions to same from Plaintiff for all of its claims other than those for the costs associated with performing the out-of-scope design work (**Exhibits 6 and 11**).  With respect to the out-of-scope work, the Government required Plaintiff to submit a separate request for modification (**Exhibits 6 and 12**).

47.     The Government's clear hope with this, as can be gleaned from the correspondence and its delay of almost two (2) years since Plaintiff started bringing the defects to its attention, was

23

to have Plaintiff execute a modification thereby waiving its "cardinal change" claim.  Plaintiff's contention that this was the Government's intended result is evident from the fact that, upon queries from Plaintiff regarding the modification and its implications, the Government almost immediately issued its Termination for Convenience (**Exhibits 6 and 13**).  The Government did this despite having sat on Plaintiff's proposals for almost one (1) year without any substantive response other than to require revisions designed to elicit its desired waiver of rights.  It also did this despite the fact that the requirements of the Task Order still exist, as evidenced by, among other things, the Government's authorization to continue work in process for the transformers and other indicia that the requirement still exists and is being continued in other ways (**Exhibit 6**).

48.     Thus, based on the aforementioned facts, it is clear the Government breached the Contract with Plaintiff since the defective work constituted a cardinal change and the Government's bad-faith termination of the Contract.

### ii.     Constructive Change and Government Delay

49.     The allegations set forth in Paragraphs 1-48 above are incorporated herein by reference as though set forth in full.

50.     A constructive change to a government contract is recoverable as an equitable adjustment to the Contract where:  (1) the government expressly or implicitly ordered the work, (2) that was outside the scope of the contract, or where the government was at fault in causing work to be performed outside the scope of the contract.  *See The Redland Co. v. United States,* 97 Fed. Cl. 736, 755-756 (2011) (citing *Miller Elevator Co. v. U.S.,* 30 Fed. Cl. 662, 678-679 (1994)).

51.     Under the scope of the Contract, any designs and specifications were provided by the Government and Plaintiff was only responsible for following the Government-designed work

and specifications. However, due to the Government's designs and specifications being materially defective, the Government caused Plaintiff to perform work outside of the scope of the contract.

52.     Due to the Government's defective designs and specifications which frustrated the purpose of the Contract, Plaintiff suffered various different costs including delay costs from the 656 days of contract time spent trying to resolve the defects, labor costs, subcontractor and subconsultant costs, material costs, and equipment costs.

53.     Thus, under the changes clause of the Contract, the Government owes Plaintiff the costs resulting from the constructive changes and under delay by the Government.

### iii.     <u>Wrongful Termination</u>

54.     The allegations set forth in Paragraphs 1-53 above are incorporated herein by reference as though set forth in full.

55.     As set forth here, the Government terminated the Contract with Plaintiff as a "Termination for Convenience." As noted, the Government cannot resort to the doctrine of constructive termination for convenience if it is "evinced bad faith or a clear abuse of discretion in its actions." *See Kalvar Corp. v. United States,* 543 F. 2d 1298, 1300-01 (Ct. Cl. 1976).

56.     The applicable termination for convenience clauses in the contract are FAR 52.249-2 and FAR 52.249-3. However, FAR 52.249-2, Alternate 1, is only applicable in part because the Contract as changed was largely for design, not construction, as contemplated by Alternate 1. Moreover, to the extent these clauses apply, they only limit the compensation claimed to the adjusted contract price to the extent that the foregoing changes are within the scope of the contract, which as demonstrated above they are not, and then as adjusted for supplies or services directed by the Government, along any recognized work in progress. FAR 52.249-2(g) and FAR 52.249-3(g).

57.     The formula to determine recovery for terminations for convenience is the percentage of the adjusted contract price reflecting the costs and other charges for the work completed, in progress, or to be settled and paid at termination, including a reasonable profit thereon, plus the reasonable settlement expenses resulting from termination.  As noted above, the Task Order price should be adjusted to account for the increased costs and additional work associated with the Government's directed changes and defective specifications, plus a reasonable profit thereon, for a total on the Task Order of $14,925,418.03 which represents Plaintiff's entitlement under the first prong.  The second prong allows for settlement expenses as well as charges appropriate to ensure fair compensation.  Plaintiff incurred costs based on the revised contract price, plus work in progress is $9,206,115.21, and administrative and legal settlement expenses attributable to the Termination for Convenience are $62,489.06.  However, the amount to which Plaintiff is entitled under either prong may be revised as the case progresses to reflect funds paid by the Government to UCC.

58.     A termination for convenience is not allowed except where "some change in circumstances between the time of award of the contract and the time of termination justifies the action." *Torncello v. United States*, 681 F.2d 756, 772 (1982).  Only modifications "outside of the scope of the original completed contract" fall under the statutory competition requirement which allows for leniency in terminations by contracting officers to address bid specifications that "inadequately describe the contract work." *Krygoski Const. Co.*, 94 F.3d at 1543.  Assuming the Government disputes the existence of "cardinal change," in light of its bad-faith termination, as authorized by *Krygoski*, Plaintiff is entitled to claim the adjusted outstanding balance of the Task Order up to its reasonable, allocable and allowable costs, and anticipated profit, which, in its business judgment were appropriate.  Included with this claim is an invoice that projects the

remaining costs under the Task Order and the contract modification for the design work. (\$ 8,162,310.28).   A schedule of the (1) costs and charges for work performed or charged, (2) reasonable profit thereon, and (3) settlement expenses, is attached to this claim and provided in (**Exhibit 31**).

### iv.    Breach of the Duty of Good Faith and Fair Dealing

59.    The allegations set forth in Paragraphs 1-58 above are incorporated herein by reference as though set forth in full.

60.    To satisfy a claim for a breach of the duty of good faith and fair dealing, Plaintiff must demonstrate that the Government acted in such a way that violates its implied obligation not to abuse its discretion, or act arbitrarily or capriciously.  *See Monarch Enters. Inc.,* ASBCA No. 31375, 86-3 BCA ¶ 19, 227.

61.    As has been explained above, despite the fact that Plaintiff provided written notice and corresponded with the Government about the blatant defects in the designs and specifications, the Government failed to remedy the situation and instead created additional hurdles for  Plaintiff to overcome.

62.    Thus, since the Government hindered the contractor's performance on the Contract and terminated the Contract in bad faith, Plaintiff is entitled to damages as a result of the Government's breach.

## V.    DAMAGES

63.    Plaintiff requests that relief be granted in the aggregate amount of \$14,925,418.03, exclusive of attorneys' fees.  Plaintiff has determined that on the breach of contract claim for cardinal change and bad-faith termination, the total amount due to Plaintiff is \$11,529,424.26.  In a request for equitable adjustment based on the constructive change and Government delay, the

total amount due to Plaintiff is $6,422,418.03. Thus, Plaintiff is claiming at least $14,925,418.03 in damages, plus applicable interest, although this may be revised as the case progresses. Moreover, because the Government's actions in this case were not taken in good faith and not substantially justified, because Plaintiff was obligated to hire legal representation in this matter, and because it is proper under the Equal Access to Justice Act, Plaintiff hereby demands payment of its attorneys' fees and costs, which continue to accrue.

## VI.   REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court:

    a.  Hold that Plaintiff has prevailed on its claims and causes of action as alleged herein;

    b.  Order that the Government is liable to Plaintiff for the damages and equitable relief sought herein;

    c.  Order that applicable Contract Disputes Act interest from the date of any certified claim and Prompt Payment Act interest begin to accrue from the date of any invoice submitted to the Government;

    d.  Should Plaintiff substantially prevail, find that Plaintiff is entitled to apply for its attorneys' fees and costs;

    e.  Grant such other relief as the Court deems appropriate.

Plaintiff respectfully requests that the Court grant each count of this Complaint and, in so doing, grant the general, specific, and extraordinary relief requested above for each count sustained, and grant such other relief as the Court may deem appropriate.

Respectfully submitted,

**NEEL, HOOPER & BANES, P.C.**

Bryant S. Banes
Texas State Bar No.  24035950
Federal ID No.  31149
Sean D. Forbes
Texas State Bar No.  24040916
Federal ID No.  603610
Sarah P. Harris
Texas State Bar No.  24113667
Federal ID No.  3421904
1800 West Loop South, Suite 1750
Houston, Texas  77027
Telephone:  (713) 629-1800
Facsimile:  (713) 629-1812
bbanes@nhblaw.com
sforbes@nhblaw.com
sharris@nhblaw.com